# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| GWENDOLYN M., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 17 CV 7900 |
| v. | ) | |
| | ) | Magistrate Judge Jeffrey I. Cummings |
| NANCY A. BERRYHILL, Acting | ) | |
| Commissioner of the U.S. Social | ) | |
| Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Gwendolyn M. ("Claimant") [1] brings a motion for summary judgment to reverse or remand the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The Commissioner brings a cross-motion asking the Court to uphold the decision to deny benefits. The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons that follow, Claimant's motion for summary judgment (Dkt. 13) is denied and the Commissioner's motion for summary judgment (Dkt. 16) is granted.

## I.    BACKGROUND

### A.    Procedural History

Claimant filed for DIB on March 14, 2014 at the age of 56, alleging disability beginning on July 12, 2010 due to diabetes. (R. 89, 168-74.) Her date last insured ("DLI") was December

---

[1] In accordance with Internal Operating Procedure 22 - Privacy in Social Security Opinions, the Court refers to Claimant only by her first name and the first initial of her last name.

31, 2014.[2]  (R. 20.)  Claimant's application was denied initially and upon reconsideration.  (R. 68-72, 74-83.)  Claimant filed a timely request for a hearing, which was held on September 14, 2016 before Administrative Law Judge ("ALJ") Kathleen Kadlec.  (R. 30-67.)  Claimant appeared with counsel and offered testimony at the hearing.  A vocational expert also offered testimony.

On February 27, 2017, the ALJ issued a written decision denying claimant's application for benefits.  (R. 18-25.)  Claimant filed a timely request for review with the Appeals Council.  (R. 166-67.)  On September 21, 2017, the Appeals Council denied claimant's request for review, leaving the decision of the ALJ as the final decision of the Commissioner.  (R. 1-4.)  This action followed.

**B.** **Medical Evidence in the Administrative Record**

**1.** **Evidence from Claimant's Treating Physicians**

The record reveals that Claimant has been under the care of primary care physician Dr. James McGarry from 2009 through 2016 for treatment of diabetes and associated problems.  At a check-up in May 2009, Claimant had no symptomatic complaints, though she was suffering occasional leg cramps at night.  (R. 271.)  She exhibited full range of motion of the extremities, with slight swelling of her right ankle due to a previous fracture in 2005.  (*Id.*)  Dr. McGarry assessed diabetes, over nourishment, and dyslipidemia, and recommended an increase in insulin.  (*Id.*)

---

[2] To be eligible for DIB, the claimant must prove that she was disabled before the expiration of her insured status.  *Shideler v. Astrue*, 688 F.3d 306, 311 (7th Cir. 2012) (citing 423 U.S.C. § 423(a)(1)(A)).

By September of 2009, Claimant's hemoglobin A1C level was up from 7.4 to 10.9, but she expressed no complaints other than continued occasional leg cramps. [3] (R. 273.) She had gained nine pounds since her last visit (up to 222), and Dr. McGarry recommended diet, exercise and additional adjustments to her insulin. (*Id*.) At Claimant's next appointment in February 2010, her A1C level had decreased, although it was unclear if she had made the proper adjustments to her insulin. (R. 274.) She again had no complaints, and exhibited full range of motion of the extremities, with adequate strength and no edema. (*Id*.) A minimal callus was noted on her left foot. (*Id*.) Dr. McGarry's assessment included a note stating, "Poor compliance, I think." (*Id*.)

On June 17, 2010, just prior to Claimant's alleged onset date, she returned to see Dr. McGarry and complained of leg cramps "at night only, not with ambulation." (R. 276.) Her lab results were "not too bad." (*Id*.) Dr. McGarry noted slight swelling and a lump on the right ankle related to the prior fracture. (*Id*.) He further noted, "[m]onofilaments intact."[4] (*Id*.) Dr. McGarry again recommended diet, exercise, and weight loss. (*Id*.) By her January 2011 appointment, Claimant had lost 29 pounds through diet and walking. (R. 277.) She had "no swelling or joint issues" and her previous ankle fracture was "not really bothering her." (*Id*.)

---

[3] The A1C test is used to monitor blood sugar levels in diabetic patients by measuring what percentage of the patient's hemoglobin is coated with sugar. For most adults with diabetes, "an A1C level of 7 percent or less is a common treatment target." The higher the A1C level, the higher the risk of complications. *A1C Test*, Mayo Clinic, https://www.mayoclinic.org/tests-procedures/a1c-test/about/pac-20384643 (last visited May 13, 2019).

[4] The monofilament test is a diagnostic tool used to check for diabetic neuropathy, a type of nerve damage that can cause pain, numbness, tingling, and decreased or increased sensitivity to touch, among other things, and which often affects legs and feet first. To administer the test, the doctor brushes a soft nylon fiber (monofilament) over areas of the skin to test the patient's sensitivity to touch. *Diabetic Neuropathy*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/diabetic-neuropathy/symptoms-causes/syc-20371580 (last visited May 13, 2019).

In August 2011, Claimant told Dr. McGarry she had not been taking her medication for a month because she was laid off from her job in the AT&T mailroom.  (R. 278.)  Her A1C and cholesterol levels were elevated.  (*Id*.)  Nonetheless, she had no discrete complaints.  (*Id*.)  She denied swelling of her extremities and exhibited full range of motion, with the exception of her right ankle.  (*Id*.)  Claimant explained that although she could not run on her ankle, she had been "walk[ing] fast for exercise."  (*Id*.)  The monofilament test was negative.  (*Id*.)  Dr. McGarry recommended to Claimant that she apply for public aid.  (*Id*.)

Claimant's only complaint in March 2012 related to morning leg cramps.  (R. 279.)  Her lab results were "much improved" and her A1C had dropped back down to 8.8.  (*Id*.)  Dr. McGarry again noted limited range of motion in the ankle, but no swelling.  (*Id*.)  He advised morning stretching to ease leg cramps.  (*Id*.)

Claimant's leg cramps had resolved by November 2012.  (R. 280.)  She was having difficulty affording her medications, but she had no complaints other than a loose toenail.  (*Id*.)  She denied any hypoglycemic episodes of sweating or fainting.  (*Id*.)  Dr. McGarry reported that, "[s]trangely enough, monofilament is intact."  (*Id*.)  Dr. McGarry contacted Claimant's brother and asked him to assist Claimant in accessing and staying on top of her medications and blood sugar checks.  (R. 281.)  Claimant's brother accompanied her to a two-week follow up appointment, at which time her lab work showed improvement.  (R. 282.)  Dr. McGarry confirmed Claimant's diabetes and dyslipidemia were "on the way to improvement," so long as she had access to medication.  (*Id*.)

In March 2013, Claimant reported she had been "vigilant" in taking her medications.  (R. 283.)  Claimant had "no difficulty ambulating," and only complained of occasional leg cramps upon waking.  (*Id*.)  Dr. McGarry saw no lower extremity swelling or tenderness and found no

neurological focal deficits.  (*Id.*)  Claimant was advised to continue with her insulin regimen and follow-up in 4-6 months.  (*Id.*)  At her follow-up appointment in July 2013, Claimant denied extremity weakness or swelling.  (R. 284.)  She denied any lesions on her feet, but she did have some minimal-moderate calluses on her pinky toes.  (*Id.*)  She exhibited decreased internal/external range of motion in her right ankle.  (*Id.*)  Dr. McGarry opined that Claimant "should qualify for diabetic shoes" and referred her to a podiatrist, as well as an optometrist.  (*Id.*)  By January 2014, Claimant's calluses had resolved and were not bothering her.  (R. 286.)  She had not yet seen the podiatrist and denied functional loss or weakness of the extremities.  (*Id.*)  The physical exam yielded unremarkable results.  (*Id.*)

Claimant returned for follow-up in August 2014.  (R, 354.)  Her A1C level was 8.1, up from 6.5 at her previous appointment.  (*Id.*)  She complained that her left third and fourth fingers were locking in place when flexed.  (*Id.*)  Claimant exhibited adequate strength and range of motion in the extremities.  (*Id.*)  She reported she had made an appointment with a podiatrist.  (*Id.*)  Dr. McGarry assessed hypertension, diabetes with an "[in]explicable increase in A1C with normal fasting sugars," anemia, trigger fingers, and minimal morning leg cramps."  (*Id.*)  He recommended Claimant see an orthopedist for her trigger fingers.  (R. 355.)

On January 26, 2015, just after the DLI, Claimant complained of pain and stiffness in the left knee and ankle, which caused difficulty climbing stairs.  (R. 356.)  She also complained of pain in the right ankle and continued decreased range of motion in the left third and fourth fingers.  (*Id.*)  She reported "some fatigue after 45 minutes of housework."  (*Id.*)  Upon physical examination, Claimant had some difficulty getting up on the table due to her pain and exhibited a left-sided limp.  (*Id.*)  She had pain with range of motion of the lower extremities, decreased sensation of the large toes bilaterally, and decreased range of motion on the third and fourth left

fingers. (R. 357.) Dr. McGarry added osteoarthritis to his assessment, and again advised Claimant to follow-up with an orthopedist. (*Id*.)

On the same date, Dr. McGarry completed a medical source statement in support of Claimant's disability application. (R. 346-47.) According to Dr. McGarry, Claimant could lift and carry 20-50 pounds occasionally, 11-22 pounds frequently; stand and/or walk for less than one hour in an eight-hour day; and sit for less than four hours. (R. 346.) Dr. McGarry further opined that Claimant could engage in frequent (2/3 of a workday) pushing/pulling with the hands, reaching, handling, fingering, and feeling; occasional (1/3 of a workday) pushing/pulling with the feet, climbing of ramps and stairs, and stooping; and could never climb ladders or ropes, balance, kneel, crouch, or crawl. (*Id*.) Dr. McGarry reported no additional visual, communicative, environmental, or cognitive limitations. (*Id*.) The limitations identified by Dr. McGarry were based on Claimant's diagnoses of osteoarthritis of the left knee and ankle, and the history of right ankle fracture. (R. 347.) When asked to identify any clinical or laboratory findings to support the diagnoses, Dr. McGarry cited to Claimant's difficulty moving from sitting to standing, a left knee limp, painful range of motion of the knees and ankles, and decreased range of motion of the left third and fourth fingers. (*Id*.) In Dr. McGarry's opinion, Claimant had been unable to work full-time since July 2010 through the date he completed the form. (R. 346.)

Claimant saw a podiatrist in May 2015 for a diabetic foot exam, at which time she reported she had been diabetic for seventeen years. (R. 417.) Claimant complained of leg cramps, but denied any tingling, burning, or numbness in her feet. (*Id*.) She explained that she could "walk a good distance without any leg pain" and "walks quite a bit every day." (*Id*.) A

physical examination revealed no swelling, full strength, and good range of motion. (R. 418.) The monofilament test was negative. (*Id*.) Claimant did not require diabetic shoes. (*Id*.)

Claimant returned to see Dr. McGarry in September 2015. (R. 415.) Her ankle was not bothering her, and she was "getting active walking exercises miles and miles." (*Id*.) She was "somewhat unhappy" that she had not been able to find any part-time work. (*Id*.) The physical exam was unremarkable, and Claimant was advised to follow-up in a year. (*Id*.)

Claimant underwent a diabetic eye examination in April 2016. (R. 409.) She had not used eye drops since her last optometry appointment five years prior. (*Id*.) Upon exam, "no ocular signs of diabetes were detected" and her cataracts only required monitoring. (R. 411.)

Claimant returned to see Dr. McGarry in June 2016, again complaining only of waking leg cramps, which lasted 30-60 seconds until she "gets active." (R. 413.) She had been watching her diet and "getting a lot of walking exercise." (*Id*.) She had full range of motion, adequate strength, and only mildly diminished sensation of the feet. (*Id*.) Her A1C level remained elevated, perhaps due to an inability to afford medications. (*Id*.) Dr. McGarry assessed uncontrolled diabetes and mild diabetic neuropathy. (*Id*.)

## 2. Evidence from Agency Consultants

On July 24, 2014, at the initial level, the state agency consultant determined that Claimant's diabetes was non-severe because it "did not cause significant limitations in basic work related activities." (R. 70.) At the reconsideration level in May 2015, another state agency consultant determined that Claimant could perform a reduced range of medium work and could sit and stand for six hours in a normal eight-hour work day. (R. 80-81.) No consultative examination was conducted.

## C. Evidence from Claimant's Testimony

Claimant appeared with counsel at the September 14, 2016 hearing and offered testimony regarding her limitations, particularly in 2014, prior to her DLI. At the time of the hearing, Claimant was 59 years old and was down to 168 pounds. (R. 35-36.) She had not worked since 2010 when she lost her job in the mailroom, and she stopped looking for full-time work in 2014. (R. 34, 51.)

Claimant complained of bad cramps in her legs upon waking, which last between one second and four minutes. (R. 45.) Claimant becomes easily fatigued upon standing, while doing light housework, or in warm temperatures. (R 39-40.) Claimant explained that she can stand for 15-30 minutes before needing to sit down and rest for the same amount of time. (R. 44.)

After breaking her ankle in 2005, Claimant was prescribed and used a cane for four months. (R. 47.) She started using the cane again in 2013 when she developed a limp, and continues to use it whenever she is outside. (R. 52.) Back in 2014, Claimant said she would have required her cane to stand on her feet for more than two to three hours. (R. 52.)

Claimant also testified about her trigger fingers, which began causing her trouble in 2014. (R. 38-39.) Claimant explained that her fingers lock up two to three times a day for up to ten minutes at a time. (R. 54.) She has difficultly gripping objects, writing, and using a keyboard. (R. 38-39.) She can lift a gallon of milk if her fingers aren't locking up. (R. 52-53.) She has not undergone any treatment for her fingers. (R. 42.) Claimant developed cataracts in 2014, which sometimes cause "milky vision." (R. 40.) Claimant takes medication for diabetes and high cholesterol. (R. 41.) She denied any side effects. (R. 42.)

On a typical day back in 2014, Claimant would wake up, wait for her leg cramps to subside, and then do light housework before needing to rest for thirty minutes. (R. 45-46.) She sometimes ran errands, but her brother would help her unload the groceries and get up the stairs

8

upon her return.  (*Id*.)  She took walks outside with her cane and could walk about two to three

blocks before needing to rest.  (R. 46-47.)  She prepared small meals for herself and washed

dishes.  (R. 48.)  She rarely socialized with others.  (*Id*.)

### D.    Evidence from the Vocational Expert's Testimony

A vocational expert ("VE") also offered testimony before the ALJ.  The VE first

classified Claimant's past work as a mailroom clerk, which is unskilled and light in the

Dictionary of Occupational Titles ("DOT"), but heavy as performed.  (R. 56.)  Next, the ALJ

asked the VE to consider a hypothetical individual of the Claimant's age, education and work

experience who: could perform medium work; frequently climb ramps and stairs, but never

ladders, ropes, or scaffolds; frequently stoop, kneel, crouch, and crawl; and must avoid

unprotected heights, moving machinery, and operating vehicles.  (R. 57.)  The VE testified that

such an individual could perform Claimant's past work as a mailroom clerk as defined in the

DOT (light and unskilled), as well as work in the medium, unskilled positions of dining room

attendant, warehouse worker, or laundry worker.  (R. 57-58.)  If the individual was limited to

only occasional stooping, kneeling, crouching, and crawling, the warehouse worker position

would be eliminated.  (R. 58.)  All medium positions would be precluded for an individual who

could only occasionally handle, finger, and feel bilaterally, required a cane, or required a

sit/stand option.  (R. 59.)

Next, the ALJ asked the VE to consider a hypothetical individual who could: perform

light work; frequently climb ramps and stairs, never ladders, ropes, or scaffolds; frequently

stoop, kneel, crouch, and crawl; and must avoid unprotected heights, moving machinery and

operating vehicles.  (R. 60-61.)  The VE testified that this individual could still perform

Claimant's past work as a mailroom clerk.  (R. 61.)  She could also work in other light, unskilled

positions, such as housekeeper, merchandise marker, or office helper. (*Id.*) An individual who was further limited to occasional stooping, kneeling, crouching, and crawling and to frequent handling bilaterally could still work in those positions. (R. 62.) Occasional handling would preclude work in those positions, but the individual could work as a theater usher. (R. 62-63.) According to the VE, required use of a cane and a sit/stand option would preclude work at the light level positions. (R. 63-64.)

The VE also explained that employers generally permit employees to be off task only ten percent of the day (exclusive of breaks) and expect employees to miss no more than five days per year. (R. 60.)

## II.    LEGAL ANALYSIS

### A.    Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. §405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §405(g). Consequently, this Court will affirm the ALJ's decision if it is supported by substantial evidence. *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015). Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Biestek v. Berryhill,* 139 S.Ct. 1148, 1154 (2019), *quoting Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1983).

This Court must consider the entire administrative record, but it will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011). This Court

will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Court will focus on whether the ALJ has articulated "an accurate and logical bridge" from the evidence to his/her conclusion. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001). At a minimum, the ALJ must "sufficiently articulate [his or her] assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning.' " *Carlson v. Shalala,* 999 F.2d 180, 181 (7th Cir. 1993) (per curiam), *quoting Stephens v. Heckler,* 766 F.2d 284, 287 (7th Cir. 1985) (internal quotations omitted). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott v. Barnhart,* 297 F.3d 589, 595 (7th Cir. 2002). Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008).

**B.      The Standard for Proof of Disability Under The Social Security Act**

In order to qualify for DIB, a claimant must be "disabled" under the Act. A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment,

whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon,* 270 F.3d at 1176. Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity ("RFC"). 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft v. Astrue*, 539 F.3d 668, 675-76 (7th Cir. 2008). The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id*. at 886.

### C.      The ALJ's Decision

The ALJ applied the five-step inquiry required by the Act in reaching her decision to deny Claimant's request for benefits. At step one, the ALJ found that Claimant had not engaged in substantial gainful activity since her alleged onset date of July 12, 2010 through her DLI of December 31, 2014. (R. 20.) Next, at step two, the ALJ determined that Claimant suffered from the severe impairments of diabetes mellitus, left trigger fingers, and status post right ankle fracture. (R. 20-21.) The ALJ explained that Claimant's prior obesity, hyperlipidemia, peripheral neuropathy, and alleged memory impairments were non-severe. (*Id*.) At step three, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled one of the Commissioner's listed impairments, after "paying particular attention to listing 1.02" (Major dysfunction of a joint). *See* 20 C.F.R. Part 404, Subpart P, App. 1.

The ALJ went on to assess Claimant's RFC, ultimately concluding that she had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), except that she can only frequently

handle, finger, and feel bilaterally; occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; and never work at unprotected heights, around moving mechanical parts, or operating a vehicle.[5] (R. 21-24.) Based on this RFC, and the testimony of the VE, the ALJ determined at step four that Claimant could perform her past relevant work as a mailroom clerk through her DLI. (R. 25.) As such, the ALJ found that Claimant was not under a disability from her alleged onset date through her DLI. (*Id*.)

### D. The Parties' Arguments in Support of their Respective Motions for Summary Judgment

In her motion for summary judgment, Claimant first argues that the ALJ improperly discredited her testimony and disregarded her subjective symptoms. According to Claimant, the ALJ discredited her testimony "for no other reason than that the objective medical evidence did not support her allegations." (Cl.'s Mot. at 5.) Claimant also argues that the ALJ incorrectly weighed the disabling opinion of her treating physician, Dr. McGarry. Specifically, she contends that the ALJ failed to consider all of Dr. McGarry's treatment notes, and that Dr. McGarry's opinion did not significantly contrast with his treatment notes as the ALJ implied.

In her responsive motion for summary judgment, the Commissioner maintains that the ALJ's decision was supported by substantial evidence. The Commissioner argues that the ALJ was proper in discounting both the opinion of Dr. McGarry and Claimant's subjective symptoms.

---

[5] The Social Security Administration defines light work as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 404.1567(b).

In doing so, the Commissioner focuses primarily on the lack of medical evidence corroborating Dr. McGarry's opinion and Claimant's complaints.

### E.    The ALJ Properly Considered Claimant's Subjective Symptoms.

Claimant first takes issue with the ALJ's assessment of her reported subjective symptoms. The ALJ must sufficiently explain his evaluation of a claimant's subjective symptoms "by discussing specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013). The ALJ's discussion must allow a reviewing Court "to determine whether [the ALJ] reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *McKinzey*, 641 F.3d at 890. The Court will only overturn the ALJ's subjective symptom assessment if it is "patently wrong," that is, lacking "any explanation or support." *Elder*, 529 F.3d at 413.

Social Security Ruling ("SSR") 16-3p provides additional guidance to the ALJ for assessing the Claimant's symptoms.[6] SSR 16-3p calls for a two-step process whereby the ALJ first determines whether the claimant has a medically determinable impairment that could reasonably be expected to produce her symptoms. SSR 16-3p, 2017 WL 4790249, *49463. Next, the ALJ must evaluate the "intensity, persistence, and functionally limiting effects of the individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities." *Id*. at 49464. In making this evaluation, the ALJ should

---

[6] Because the ALJ issued her ruling after March 28, 2016, SSR 16-3p, which superseded SSR 96-7p, applies here. *See* SSR 16-3p, 82 FR 49462-03, 2017 WL 4790249, n.27. SSR 16-3p shifted the focus from a claimant's credibility to clarify that "subjective symptom evaluation is not an examination of the individual's character." *Id*. at 49463; *see also Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016) (noting that ALJs are not "in the business of impeaching claimants' character"). SSR 96-7p and SSR 16-3p "are not patently inconsistent with one another," and a "comparison of the two Rulings shows substantial consistency, both in the two-step process to be followed and in the factors to be considered in determining the intensity and persistence of a party's symptoms." *Shered v. Berryhill*, No. 16 CV 50382, 2018 WL 1993393, at *5 (N.D.Ill. Apr. 27, 2018).

consider the entire case record, along with (1) the claimant's daily activities; (2) location, duration, frequency, and intensity of pain or symptoms; (3) precipitation and aggravating factors; (4) type, dosage and side effects of medication; (5) treatment other than medication; and (6) any other factors concerning the claimant's functional limitations and restrictions. *Id.* at 49465-66; 20 CFR § 404.1529(c)(3).

The ALJ followed this two-step process here, first determining that Claimant's impairments could reasonably be expected to cause Claimant's alleged symptoms, such as an inability to walk for long distances, trigger fingers, and leg cramps. *See supra* at pp. 7-9. But, at step two, the ALJ found that Claimant's statements regarding those symptoms "are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 22.) The reasons the ALJ proceeded to provide allow this Court to conclude that the ALJ reached her decision in a rational manner, supported by the evidence of record. *McKinzey*, 641 F.3d at 890.

First, the ALJ pointed out that the medical evidence prior to Claimant's DLI does not support her allegations because it "shows no consistent complaints, evidence of noncompliance, minimal deficits upon exam, and exercise." (R. 23.) The ALJ then reviewed Dr. McGarry's treatment notes beginning in 2011, and consistently noted the primarily benign results on physical exam, routine treatment, minimal complaints by Claimant, and her continued ability to walk for exercise. (*Id.*)

Claimant is certainly correct that an ALJ may not discount a claimant's symptom statements solely because they are not substantiated by objective evidence. SSR 16-3p, 2017 WL 4790249, *49465; *see also Pierce v. Colvin*, 739 F.3d 1046, 1049-50 (7th Cir. 2014) ("An ALJ may not discount a claimant's credibility just because her claims of pain are unsupported by

significant physical and diagnostic examination results."). However, a "lack of objective support from physical examinations and test results" remains relevant to the ALJ's assessment. *Pierce*, 739 F.3d at 1050. Here, the treatment record as a whole, including Claimant's own contemporaneous statements to Dr. McGarry regarding her symptoms and abilities, supports the ALJ's subjective symptom analysis. *See Elder*, 529 F.3d at 413-14 (upholding the ALJ's decision to disregard the claimant's testimony because it contradicted Claimant's previous reports to her doctor of regular exercise); *see also Sienkiewicz v. Barnhart*, 409 F.3d 798, 804 (7th Cir. 2005) ("discrepancy between the degree of pain claimed by the applicant and that suggested by medical records is probative of exaggeration.").

The ALJ also cited to Claimant's history of non-compliance in discrediting her allegations. Notably, as she was required to do, the ALJ recognized that this non-compliance was, at least in part, due to a lack of insurance. *See Hayes-Jackson v. Colvin*, No. 2:15-CV-315-JEM, 2016 WL 5439872, at *6 (N.D.Ind. Sept. 29, 2016) ("When considering non-compliance with treatment as a factor in determining whether a claimant is impaired, an ALJ is required to make a determination about whether non-compliance with treatment is justified and develop the record accordingly.") (citing *Thomas v. Colvin*, 826 F.3d 953, 961 (7th Cir. 2016)). But more important to the ALJ's assessment here was that even when Claimant's A1C levels were elevated due to non-compliance, she continued to deny complaints, functional loss, or weakness in her extremities. (R. 24.) The ALJ also noted that Claimant had not sought treatment for her trigger fingers, and further emphasized the fact that Claimant did not stop working due to her condition, but was instead let go by her employer.

Lastly, the ALJ cited to Claimant's failure to see a podiatrist as a reason to discredit her allegations. Claimant is correct that this is a misstatement by the ALJ because the record shows

she did see a podiatrist in May 2015.  However, at that appointment, Claimant reported she "walks quite a bit every day," and the podiatrist determined that she did not need diabetic shoes. (R. 417-18.)  Thus, evidence from this appointment supported the ALJ's symptom assessment notwithstanding the ALJ's mistaken failure to realize that this was a podiatric appointment.[7] Where, as here, the ALJ's subjective symptom analysis is otherwise supported by sufficient evidence, the ALJ's misstatement does not require remand.  *See Shideler* 688 F.3d at 306, n.1 (affirming the ALJ's decision where a misstatement "did not affect the outcome of the proceeding.").  For all of these reasons, Claimant has failed to show that the ALJ's subjective symptom assessment was patently wrong.

### F.    The ALJ Offered Good Reasons for Discounting Dr. McGarry's Opinion.

Claimant also argues that the ALJ erred when she gave no weight to the opinion of her treating physician, Dr. McGarry.  Under the treating physician rule applicable to this case, the ALJ must give a treating source's opinion controlling weight "if it is well-supported and not inconsistent with other substantial evidence."[8]  *Stage v. Colvin*, 812 F.3d 1121, 1126 (7th Cir. 2016); *see also* 20 C.F.R. § 404.1527(c).  When controlling weight is not given, an ALJ must offer "good reasons" for doing so, after considering the "length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion."  *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); 20 C.F.R. § 404.1527(c).  While "an inadequate evaluation of

---

[7]  The ALJ referenced this appointment at step two of her analysis, (*see* R. 20), but she evidently did not realize that the appointment was with a podiatrist.

[8]  For claims filed on or after March 27, 2017, the treating physician rule has been modified to eliminate the controlling weight instruction.  *Kaminski v. Berryhill*, 894 F.3d 870, 876 (7th Cir. 2018), amended on reh'g (Aug. 30, 2018).  Opinion evidence in such claims is now governed by 20 C.F.R. §§ 404.1520c, 416.920c.

a treating physician's opinion requires remand," *Cullinan v. Berryhill*, 878 F.3d 598, 605 (7th Cir. 2017), courts will uphold "all but the most patently erroneous reasons for discounting a treating physician's assessment." *Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (citing *Luster v. Astrue*, 358 Fed. Appx. 738, 740 (7th Cir. 2010)).

As explained above, *supra* at pp. 5-6, Dr. McGarry completed a medical source statement on January 26, 2015. According to Dr. McGarry, Claimant could lift and carry 20-50 pounds occasionally, 11-22 pounds frequently; stand and/or walk for less than one hour in an eight-hour day; and sit for less than four hours. (R. 346.) Dr. McGarry further opined that Claimant could engage in frequent pushing/pulling with the hands, reaching, handling, fingering, and feeling; occasional pushing/pulling with the feet, climbing of ramps and stairs, and stooping; and could never climb ladders or ropes, balance, kneel, crouch, or crawl. (*Id*.) In Dr. McGarry's opinion, these limitations were the result of Claimant's osteoarthritis of the left knee and ankle, and her prior right ankle fracture. (R. 347.) The clinical findings listed as supporting Claimant's limitations were her difficulty moving from sitting to standing, a left knee limp, painful range of motion of the knees and ankles, and decreased range of motion of the left third and fourth fingers. (*Id*.) Dr. McGarry believed that Claimant had been unable to work full-time since July 2010. (R. 346.)

The ALJ afforded Dr. McGarry's opinion "no weight."[9] In doing so, the ALJ explained that Dr. McGarry's opinion "significantly contrasts with [his] treatment notes, which note

---

[9] Notably, the ALJ and Dr. McGarry agreed regarding some aspects of Claimant's capabilities. In particular, they agreed Claimant could satisfy the lift and carry requirements of light work; could frequently handle, finger and feel; and could occasionally climb ramps and stairs, but never ladders or ropes. Where their opinions diverge relates primarily to Claimant's ability to sit and stand during the work day.

minimal complaints and minimal deficits in exams." (R. 24.) The Court finds no reversible error in the ALJ's treatment of Dr. McGarry's opinion.

At the outset, it is worth noting that the ultimate question of disability is reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d)(2) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."). Thus, the ALJ was not required to accept the opinion of Dr. McGarry that Claimant had been unable to work since July of 2010. On the other hand, the ALJ cannot simply disregard the opinion of a treating physician without providing sufficient reasons to do so. The ALJ has provided sufficient reasons here, after implicitly considering the factors enumerated in 20 C.F.R. § 404.1527(c). *See Schreiber v. Colvin*, 519 Fed. Appx. 951, 959 (7th Cir. 2013) (upholding opinion despite ALJ not "explicitly" considering each factor where the "decision makes clear that the [ALJ] was aware of and considered many of the factors…").

First, the ALJ properly reviewed the Claimant's treatment history with Dr. McGarry, whom the ALJ identified as a primary care physician. (R. 23-24.) As explained above, *supra* at pp. 15-16, the ALJ reviewed a number of records and emphasized the lack of "consistent complaints, evidence of noncompliance, minimal deficits upon exam, and exercise." (R. 23.) Again, the ALJ acknowledged that even when Claimant's blood levels were uncontrolled, Dr. McGarry noted minimal functional complaints, if any, good range of motion, and continued exercise. (*Id*.) While at times Dr. McGarry acknowledged swelling, cramps, or limited range of motion of the ankle, these findings were rarely, if at all, accompanied with notations of limitations or treatment recommendations that would support the extreme postural limitations recommended by Dr. McGarry. Indeed, the Claimant continued to walk for exercise throughout her treatment with Dr. McGarry, including just a few months after he submitted his opinion.

(*See* R. 417 (telling podiatrist in May 2015 she can "walk a good distance without any leg pain" and "walks quite a bit every day").)  On this record, the ALJ reasonably discredited the opinion of Dr. McGarry where it was "internally inconsistent" with *his own* longitudinal treatment records, among other evidence of record.  *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *see also Richison v. Astrue*, 462 Fed. Appx. 622, 625 (7th Cir. 2012) ("The ALJ did not err here in determining that [the treating physician's] opinion conflicted with other medical evidence, including his own treatment notes.").

Claimant also argues that the ALJ only cited to exhibit 1F in her analysis of Dr. McGarry's opinion, "indicating that she only evaluated that exhibit, which includes Dr. McGarry's notes from May 2, 2009 through January 16, 2014." (Cl.'s Mot. at 10.)  According to Claimant, the ALJ improperly ignored Dr. McGarry's treatment records from August 2014 through June 2016 (Exs. 3F & 9F), which "document the finger problem as well as the leg problems." (Cl.'s Mot. at 10.)  Contrary to Claimant's assertion, however, the ALJ did cite to and explicitly consider treatment records from that later time period.  (*See* R. 21 (citing Ex. 9F and noting that a "review of the records after her date last insured indicates minimal exam findings with no substantive complaints as the claimant was walking for exercise"); and R. 23 (reviewing the August 2014 appointment at Ex. 3F and noting full range of motion, adequate strength, and some triggering of the fingers).)  As such, the ALJ properly considered the entire record, including Dr. McGarry's post-DLI evidence.  *See Parker v. Astrue*, 597 F.3d 920, 925 (7th Cir. 2010) (explaining that an ALJ must "consider all relevant evidence, including the evidence regarding the plaintiff's condition at present" to determine whether the plaintiff was disabled by his DLI).

More importantly, it is undisputed that the Claimant must prove her disability prior to her DLI of December 31, 2014. *See Shideler*, 688 F.3d at 311 (citing 423 U.S.C. § 423(a)(1)(A)). "The Seventh Circuit has recognized that worsening of a claimant's condition after the date last insured *does not* provide a basis for granting benefits during the relevant time period." *Vincent A. v. Berryhill*, No. 16 C 7136, 2019 WL 2085104, at *8 (N.D.Ill. May 13, 2019) (quotation omitted) (emphasis added); *see also Martinez v. Astrue*, 630 F.3d 693, 699 (7th Cir. 2011) (affirming ALJ's decision despite worsening symptoms after DLI where records prior to DLI showed claimant was asymptomatic); *Thomas v. Astrue*, 352 Fed. Appx. 115, 116 (7th Cir. 2009) (same); *Million v. Astrue*, 260 Fed. Appx. 918, 921–22 (7th Cir. 2008) (explaining that post-DLI medical records were "relevant only to the degree that they shed light on [the claimant's] impairments and disabilities from the relevant insured period"). So, although Claimant relies heavily on records of worsening trigger fingers and mobility immediately following her DLI, she fails to distinguish the above authority or explain how those records support a finding of disability prior to her DLI. For all of these reasons, the ALJ's consideration of Dr. McGarry's records and his opinion are supported by substantial evidence.

## III.     CONCLUSION

For the foregoing reasons, this Court finds that the ALJ's opinion is supported by substantial evidence and free from legal error. Accordingly, Claimant's motion for summary judgment (Dkt. 13) is denied and the Commissioner's motion for summary judgment (Dkt. 16) is granted. It is so ordered.

ENTERED:

_____
**Jeffrey I. Cummings**
**United States Magistrate Judge**

**Dated: May 22, 2019**